**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ARIS SISWANTO, Personal Representative of the Heirs of Mrs. Susiyah, deceased, et al., | ) ) ) | |
| *Plaintiffs,* | ) ) | No. 15-cv-5486 |
| v. | ) ) | Hon. John Robert Blakey |
| AIRBUS AMERICAS, INC., et al., | ) ) ) | |
| *Defendants.* | ) | |

**DEFENDANTS' JOINT MEMORANDUM OF LAW IN SUPPORT**
**OF THEIR MOTION TO DISMISS FOR *FORUM NON CONVENIENS***

Defendants Honeywell International Inc. ("Honeywell"), Doric Corp. ("Doric"), and Goodrich Corporation ("Goodrich") (collectively, "Defendants") file this Joint Memorandum of Law In Support of Their Motion to Dismiss for *Forum Non Conveniens*, and state as follows:

## I.  INTRODUCTION

This case arises out of the crash of an Indonesian flight, operated by an Indonesian airline, carrying almost exclusively Indonesian citizens. It was the second-deadliest crash in the history of Indonesia and involved an aircraft not manufactured or operated in the United States. Despite the compelling connection of this case to Indonesia and the convenience of litigating this matter there, Plaintiffs elected to file their case here in the United States. This is the exact type of case for which the *forum non conveniens* (or "FNC") doctrine exists.

In sum, Plaintiffs' claims center around a series of events that occurred entirely within Indonesia and involve predominantly Indonesian citizens. It is Indonesia, not the United States, that is the most appropriate forum for the adjudication of Plaintiffs' claims, and dismissal is therefore warranted on the grounds of *forum non conveniens*.

1

## II. <u>FACTUAL BACKGROUND</u>

**A.      The Accident and Aircraft.**

On December 28, 2014, Indonesia AirAsia Flight 8501 crashed in the Java Sea near Borneo, Indonesia, while en route from Surabaya, Indonesia to Singapore. Ex. A, Aircraft Accident Investigation Report ("Final Report"), at 13. At the time of the crash, the flight was operating in Indonesian airspace under the direction of Indonesian air traffic control. *Id.* at 15. The crash resulted in the deaths of all 162 people aboard, whose nationalities were as follows: 155 Indonesian, 3 South Korean, 1 French, 1 Malaysian, and 1 Singaporean. *Id.* at 17-18.

The subject aircraft, an Airbus 320-216, Registration No. PK-AXC (the "Aircraft"), was operated by PT Indonesia AirAsia ("AirAsia"), which is an Indonesian airline headquartered in Tangerang, Indonesia. *Id.* at 67. All manufacturing of the Aircraft occurred in Europe. Ex. B, Bondergaard Decl. ¶ 24. The Aircraft was originally sold to a Malaysian airline that does not operate in the U.S., and at the time of the accident, the Aircraft was owned by Doric 10 Labuan Limited Company, a Malaysian company, who is not a party to this litigation. Ex. B, ¶ 7; Ex. A, at 67. The Aircraft has never operated in the U.S., and the Airbus A320-216 line is neither operated in the U.S. nor certified by the Federal Aviation Administration. Ex. B, ¶¶ 10-11, 14. Airbus has never delivered any new Airbus aircraft in the United States. *Id.*, ¶ 20.

**B.      The Indonesian Investigation of the Accident and AirAsia.**

Indonesia's National Transportation Safety Committee (the Komite Nasional Keselamatan Transportasi or "KNKT" in Indonesian) conducted the official investigation of this accident and issued its Final Report on December 1, 2015. *See generally* Ex. A, at 117-25. Australia, France, Singapore, and Malaysia joined the KNKT in its investigation, while the U.S. National Transportation and Safety Board ("NTSB") did not participate. *See id.* at 13. During its

investigation, the KNKT examined data from the Cockpit Voice Recorder ("CVR") and Flight Data Recorder ("FDR"); interviewed AirAsia maintenance and pilot personnel; and reviewed maintenance records, meteorological information, and other flight data. *See id.* at 117-22.

The Final Report concludes that, during the accident flight, the pilots experienced four malfunctions of the Aircraft's Rudder Trim Limiter Unit ("RTLU").[1] *Id.* at 117. These malfunctions caused warnings to appear in the Electronic Centralized Aircraft Monitoring ("ECAM") display[2] but did not otherwise affect "the continuity of safe flight as the autopilot, auto-thrust and other systems controlled by the FAC[3] [were] still available." *Id.* at 117, 106. The pilots properly followed the procedures for troubleshooting the first three RTLU malfunctions by switching the RTLU on and off, which caused it to return to normal functionality. *Id.* at 117, 121. The fourth time, however, the FDR indicated that the pilots reset the FAC circuit breakers, which triggered an electrical interruption and ultimately led to disengagement of the Aircraft's autopilot and other flight protections. *Id.* at 105, 117-18. The rudder deflected 2° and the Aircraft rolled 54° to the left without input from the pilots. *Id.* The First Officer, who was at the controls at the time, failed to properly level the aircraft when attempting to correct the roll, possibly due to his lack of experience and spatial disorientation. *See id.* at 22, 118. When the Captain subsequently attempted to take back the controls, he failed to properly communicate that action to the First Officer using the standard call-and-response commands, or "callouts," required of flight crew, the purpose of which is to ensure effective communication and situational awareness among the pilots. *Id.* at 112-13, 119. As a result of this miscommunication and the pilots' failure to properly

---

[1] A RTLU regulates the aircraft's rudder movement by limiting rudder deflection based on speed to avoid high structural loads. Ex. A, Final Report at 36.

[2] The ECAM displays data concerning aircraft systems and failures and also acts as a diagnostic tool displaying the corrective action to be taken in the event of a failure, as well as system limitations following any such failures. *Id.* at 72-73.

[3] A Flight Augmentation Computer, or FAC, controls electrical signals to the rudder system, among other functions including low level energy warnings, wind shear detection and flight envelope functions. *Id.* at 37.

react, the KNKT found that the pilots caused the Aircraft "to depart from the normal flight envelope and enter a prolonged stall condition that was beyond the capability of the flight crew to recover." *Id.* at 121-22.

According to the KNKT's review of AirAsia's maintenance records, the RTLU had malfunctioned twenty-three times within the past year, and the interval between those incidents became shorter and more prevalent in the three months prior to the crash. *Id.* at 26-27. Notably, three days before the flight, the Captain of the subject flight encountered the same electrical issue on the Aircraft while it was grounded. *Id.* at 21. According to maintenance personnel, the Captain observed them resolve the issue by resetting the FAC circuit breakers, and was told he could "reset [the FAC circuit breakers] whenever instructed" by the ECAM. *Id.* The reset that occurred during the accident flight, however, was neither instructed by the ECAM, described in the Airbus manuals, nor included in the list of circuit breakers allowed to be reset in-flight. *Id.* at 106. The Final Report concludes that "[t]he experience of the [Captain] witnessing problem solving by resetting the [circuit breakers] on 25 December 2014 might have influenced [him] to adopt the same procedure when confronted with the same problem." *Id.* at 119.

The KNKT also found that the airline did not have a clearly stated policy for recording defect handling to identify repetitive defects required by the company's maintenance manual. *Id.* at 116. As a result, maintenance personnel were not aware that each RTLU malfunction actually represented a repetitive problem, which, had it been identified, would have triggered additional maintenance actions. *Id.* As found by the KNKT, AirAsia's maintenance system "resulted in a missed opportunity to identify and rectify a series of recurring RTLU faults." *Id.*

According to the Final Report, AirAsia's company manuals are approved by the Indonesia Directorate General of Civil Aviation ("DGCA"). *Id.* at 69. The investigation revealed

that the pilots had not been instructed on recovery training during upset conditions because AirAsia did not believe such training was required by the DGCA. *Id.* at 67. The KNKT's safety recommendations focused on the implementation of better upset-recovery training and aircraft maintenance systems for AirAsia to implement and the DGCA to require. *Id.* at 123-25. While Plaintiffs do not bring claims against AirAsia, they do assert that AirAsia "had been placed on the European Union's 'blacklist' and [was] prohibited from entering the airspace of a member State of the EU because of its failure to meet EU regulatory standards." (Doc. 70 at 11).

**C.     The Parties.**

Plaintiffs, who are heirs and personal representatives of the estates of several deceased passengers, filed suit in this Court, asserting wrongful death and survival claims against multiple defendants stemming from the crash. The Third Amended Complaint, filed February 18, 2016, names Airbus Americas, Inc. ("Airbus Americas"), Meggitt PLC ("Meggitt"), Artus S.A.S. ("Artus"), Thales Avionics S.A.S. ("Thales"), Honeywell, Doric, and Goodrich as defendants (Doc. 70). Plaintiffs only allege that they, and their decedents, are "citizens of countries other than the United States." *Id.* The complaint omits AirAsia as a defendant, which Plaintiffs' counsel acknowledged is due to the fact that AirAsia cannot be sued in the United States. *See id.*; Ex. C, *11 families sue Airbus for negligence*, THE STRAITS TIMES, at 2 ("AirAsia was not named in the lawsuit because the US has no jurisdiction over the airline . . . .").

Prior to filing the Third Amended Complaint, Plaintiffs had sued Airbus, the French manufacturer of the Aircraft, but Airbus was dismissed based upon lack of personal jurisdiction. (Doc. 63; Doc. 32 at 3-7).[4] Plaintiffs alleged that Airbus defectively designed and manufactured the Aircraft and its various component parts, including its RTLU, as well as negligently provided

---

[4] The Second Amended Complaint also named Motorola, Inc. and United Technologies Corporation as defendants; however, both those entities have been voluntarily dismissed. (Doc. 69).

warnings, instructions, advice and high altitude recovery training to the AirAsia flight crew, among other things. (Doc. 32 at 4, 6-7). Plaintiffs' Third Amended Complaint names Airbus Americas (not Airbus), who is alleged to have marketed and assisted in the promotion of the Aircraft's sale, but not in its design or manufacture. (Doc. 70 at 4).

As to the other foreign defendants, Thales, a French company that allegedly manufactured the pitot tubes and software for the FACs on the Aircraft, intends to move to dismiss for lack of personal jurisdiction. (Doc. 69; 70 at 3, 19). Artus and Meggitt, who have yet to appear, are incorporated in France and the United Kingdom, respectively, and allegedly designed and manufactured the Aircraft's RTLUs. (Doc. 70 at 3, 24).

The remaining defendants, who are all U.S. corporations and have jointly filed the instant motion, are Honeywell, Doric, and Goodrich. Plaintiffs allege that Doric, a U.S. corporation, owned the Aircraft, though the Final Report correctly identifies Doric 10 Labuan Limited Company, a Malaysian company, as the owner. (Doc. 70 at 11-12; Ex. A, at 67). Plaintiffs also allege that Honeywell manufactured the Aircraft's Air Data Inertial Reference Units ("ADIRU"),[5] and that Goodrich manufactured the Aircraft's in-flight ice detection system and the servo valve on the yaw damper. (Doc. 32 at 12, 30). The Final Report does not implicate the ADIRU, ice detection system or the yaw damper servo valve as a cause of the crash. (*See* Ex. A).

## III. ARGUMENT

### A. DISMISSAL FOR *FORUM NON CONVENIENS* IS WARRANTED BECAUSE ALL RELEVANT FACTORS WEIGH STRONGLY IN FAVOR OF INDONESIA AS THE PROPER AND MORE CONVENIENT ALTERNATIVE FORUM.

The FNC doctrine enables a district court to decline jurisdiction over an action which would otherwise be proper when another forum is more convenient to hear the case. *In re Air*

---

[5] The ADIRU supplies air data (airspeed, angle of attack and altitude) and inertial reference (position and altitude) information to the pilot's electronic flight instrument displays.

*Crash Disaster over Makassar Strait, Sulawesi*, 2011 U.S. Dist. LEXIS 2647, at *12 (N.D. Ill. Jan. 11, 2011) (citing *Clerides v. Boeing Co.*, 534 F.3d 623, 627-28 (7th Cir. 2008)). It is well-settled that a foreign plaintiff's choice of a U.S. forum is not given the same deference afforded to U.S. citizens. *See Abad v. Bayer Corp.*, 563 F.3d 663, 667 (7th Cir. 2009). As recognized by the Supreme Court, when foreign plaintiffs bring suit in the United States, their choice of forum is not presumed to be based on convenience. *See, e.g.*, *Piper Aircraft*, 454 U.S. at 256; *accord In re Factor VIII or IX Concentrate Blood Prods. Litig.*, 484 F.3d 951, 956 (7th Cir. 2007) ("[I]f the plaintiff is suing far from home, it is less reasonable to assume that the forum is a convenient one and therefore the presumption in the plaintiff's favor applies with less force[.]"). Thus, dismissal on the grounds of *forum non conveniens* is appropriate if: (1) there is an adequate and available alternative forum in which the case may be tried, and (2) the private and public interest considerations favor dismissal. *See Kamel v. Hill-Rom Co.*, 108 F.3d 799 (7th Cir. 1997).

Dismissal is warranted here because the following facts show that this case is centered and belongs in Indonesia, not the United States:

- The case involves an Indonesian flight, operated and maintained by an Indonesian airline, which crashed in Indonesian waters while carrying predominantly (96%) Indonesian citizens;

- The Indonesian government took the lead in investigating the crash and recently issued a Final Report of its findings as to the facts surrounding the crash and its possible causes;

- Critical liability evidence related to the aircraft maintenance, operation, and pilot training from that investigation remains in Indonesia and under the control of its government; and

- Indonesian witnesses and potentially responsible third parties, i.e., AirAsia, are located in Indonesia, beyond this Court's jurisdiction and subpoena power.

These connections heavily favor Indonesia as the most convenient forum for the parties and witnesses, and support the interest of justice for a fair adjudication of this case. In addition, Indonesia is an adequate and available alternative forum.

As a backdrop to the present litigation, this Court's prior analysis and decision in *In re Air Crash over Makassar Strait, Sulawesi* ("*Makassar Strait*") is remarkably on point and should be followed again here. 2011 U.S. Dist. LEXIS 2647 (N.D. Ill. Jan. 11, 2011). There, an Indonesian airline, traveling between the Indonesian islands of Java and Sulawesi, disappeared over the Makassar Strait. *Id.* at *4. When the wreckage from the accident Boeing 737 was located nine days later in the waters off the coast of Sulawesi, all 102 passengers and crew members (99 Indonesians and 3 U.S. citizens) were presumed dead. *Id.* There, like here, the KNKT led the investigation, and, because Boeing is a U.S. aircraft manufacturer (unlike Airbus) the NTSB joined the investigation. *Id.* at *5. The KNKT's report concluded that the aircraft's Inertial Reference System ("IRS") malfunctioned, which caused the pilots to troubleshoot the IRS and led to the inadvertent disconnection of the autopilot. *Id.* at *5-6. With the autopilot disengaged, the aircraft began to roll to the right, unbeknownst to the pilots. *Id.* at *5. When the crew finally realized the situation, they failed to level the plane's wings first, as is the standard operating procedure, and lost control of the aircraft. *Id.* at *5-6. The airline's records also disclosed that for a three month period just before the accident, maintenance failed to follow procedures to repair recurring complaints with the IRS. *Id.* at *6. The final report cited the IRS malfunction, "inadequate maintenance," and "pilot error" as contributing causes of the crash. *Id.* Representatives of the decedents filed suit in this Court, alleging strict products liability and negligence against several U.S. defendants, including the aircraft manufacturer (Boeing), the IRS manufacturer, a maintenance company, and the owner and lessor of the plane. *Id.* at *8-9. None of the representatives who filed suit were U.S. citizens, nor were their decedents. *Id.* at *8.

The *Makassar Strait* defendants moved to dismiss the case on the grounds of FNC, asserting that much of the essential evidence and responsible third parties (namely, the airline

and maintenance personnel) were in Indonesia. *Id.* at \*10-11. The plaintiffs, on the other hand, argued that the United States was the more convenient forum because evidence of the design and manufacture of the aircraft and its component parts, as well as testimony from those individuals who participated in these processes, was located in the United States. *Id.* at \*11-12.

After establishing that Indonesia was an adequate and available forum, the Court concluded that the plaintiffs' argument regarding the U.S. evidence carried "little weight" in light of the fact that the U.S. defendants had agreed to make available all relevant evidence in their possession at the direction of the Indonesian forum. *Id.* at \*19-20. The Court further noted that, conversely, those in possession of much of the remaining critical evidence, namely, the aircraft operator and the Indonesian governmental investigators, were in Indonesia. *Id.* at \*21-22. Likewise, the Court found that the United States' passing interest in the safety of U.S. products abroad was significantly outweighed by the overwhelming connections and interest the Indonesian public had in the litigation. *Id.* at \*25-27. Therefore, because all private and public interest factors weighed so heavily in favor of Indonesia, the case was dismissed. *Id.*

The facts in *Makassar Strait* are strikingly similar to those presented in this case, and the factors that weighed heavily in favor of dismissal there are even more prevalent here, given that Plaintiffs cannot establish jurisdiction over the Aircraft manufacturer here.

       **1.**       **Indonesia Is an Adequate and Available Alternative Forum.**

The first step in the *forum non conveniens* analysis is to determine whether an adequate alternative forum is available. *Kamel*, 108 F.3d at 802. A forum is available when all parties are amenable to process and within the forum's jurisdiction, and adequate "when the parties will not be deprived of all remedies or treated unfairly." *Id.* at 803.

There is no question Indonesia is an adequate and available alternative forum. This was determined in *Makassar Strait*, consistent with the long line of cases that have steadily held that Indonesia is an available and adequate alternative forum for the claims made here. *Makassar Strait*, 2011 U.S. Dist. LEXIS 2647, at *17-18; *accord Lumenta v. Bell Helicopter Textron, Inc.*, 2015 Tex. App. LEXIS 9062, at *17-18 (Tex. App. Ct. Aug. 27, 2015) (citing cases and granting FNC dismissal of Indonesian helicopter accident based, in large part, on *Makassar Strait*). Nothing has changed to unwind the well-reasoned decisions from this Court and numerous other courts on Indonesia's adequacy and availability, and the result should be the same here.

As further substantiated by Defendants' Indonesian law expert, Indonesia provides Plaintiffs with an available forum for their claims. (Ex. D, ¶ 13). Specifically, Defendants are amenable to process in Indonesia, and the applicable Indonesian statutes and rules provide Indonesian courts with various avenues by which to establish jurisdiction over a foreign party. *Id.*, ¶¶ 27-32. Indeed, Indonesia law provides a long-arm statute, which gives Indonesian courts jurisdiction over foreign parties who owe obligations to an Indonesian or have obligations that must be performed in Indonesia. *Id.*, ¶ 29. Moreover, as the remaining U.S. defendants here consent to jurisdiction in Indonesia, this alone establishes Indonesia's availability. *Makassar Strait*, 2011 U.S. Dist. LEXIS 2647, at *20; (Ex. D, ¶ 30; Group Ex. E, Stipulations).

Indonesia is also an adequate forum because it offers Plaintiffs analogous causes of action and provides procedural safeguards, efficient court systems, and remedies. (Ex. D, ¶¶ 13, 64-73). Numerous rules govern the filing of documents similar to pleadings and motions, the presentation of fact and expert witnesses, mediation, evidentiary considerations, hearings, trial, and appellate proceedings, as well as the trial court's authority to compel the production of relevant evidence and appearance of witnesses in Indonesia. *Id.*, ¶¶ 34-41. Further, no statute of

limitations will bar these claims, and in any event, Defendants will agree to toll any applicable statute of limitations for one year following dismissal. *Id.*, ¶¶ 32-33; (Ex. E).

Thus, Plaintiffs have an avenue to seek redress under Indonesian law for the deaths of their decedents, and Indonesia is therefore an available and adequate forum to litigate this case.

### 2. Both Private and Public Interest Factors Strongly Favor Indonesia.

Because Indonesia is an adequate and available forum, the Court must next weigh the private and public interests in the litigation to determine which forum is more convenient. In short, the private interest factors weigh the convenience of the litigants, while the public interest factors look to which forum is more interested in the litigation. *See Clerides*, 534 F.3d at 628. Both the private and public interest factors here weigh heavily in favor of dismissal.

#### a. Private Interest Factors.

In weighing the relative ease of access to sources of proof, the ability and cost to compel attendance of unwilling and willing witnesses, and all other practical problems in litigating this case in the U.S. compared to Indonesia, it is undeniable that these private interest factors tip decisively in favor of Indonesia. *See Makassar Strait*, 2011 U.S. Dist. LEXIS 2647, at *13.

As in *Makassar Strait*, the KNKT's investigation here uncovered substantial questions regarding the airline's maintenance of the aircraft, its quality of operations, the competency and training of its pilots, and the oversight of the airline by the Indonesian DGCA. These factors led the *Makassar Strait* court to find that much of the remaining proof and location of witnesses beyond the court's compulsory process weighed heavily in favor of the Indonesian forum. *Id.* at *21-22. This is exactly the case here with AirAsia. If this case proceeds in the United States, it will do so without AirAsia for two reasons. First, Plaintiffs acknowledge they lack jurisdiction over AirAsia in the United States. Second, AirAsia has refused to produce any evidence in the

U.S. *See id.* at *21-23; Ex. C, at 2; (Ex. F, Letter by Peng Lim). By contrast, if these cases were re-filed in Indonesia, Plaintiffs could pursue AirAsia directly, and if they elected not to, Defendants would have an opportunity to implead AirAsia. (Ex. D, ¶¶ 51-57). As in *Makassar Strait*, "the inability to implead [AirAsia] in this litigation weighs in favor of dismissal." *Id.* at *23; *Factor III*, 531 F. Supp. 2d at 973 ("[T]he inability to join third parties is a substantial private interest factor weighing in favor of dismissal.").

Further, like in *Makassar Strait*, all documents and witnesses relevant to liability and damages are located in Indonesia. Indonesia is where the aircraft was maintained, inspected, and operated; where the pilots and crew were trained and performed their jobs; and where the Indonesian DGCA performed its oversight of the airline. (*See* Ex. A, at 123-25); *accord Makassar Strait*, 2011 U.S. Dist. LEXIS 2647, at *21-22. Other important liability evidence is also located in Indonesia and in the possession of the KNKT, who gathered information, assembled and reviewed records, interviewed witnesses, and examined the available data from the CVR and FDR, which are relevant to determining the cause of the accident, substantiating the claims and defenses made in this litigation, and can only be found and obtained in Indonesia. (*See* Ex. A, at 13-14, 117-22). Indonesia, not the U.S., is also the location of Plaintiffs' damages evidence, including documents and witnesses necessary to evaluate any claimed economic losses (e.g., employers, bank records, pay stubs, employment records, and medical records regarding life expectancy), as well as non-economic losses (e.g., testimony of family, friends, and others with knowledge of the relationships between decedents and beneficiaries). The sum of these factors weighs heavily in favor of dismissal. *See Makassar Strait*, 2011 U.S. Dist. LEXIS 2647, at *25 (finding evidence relating to flight crew, airline and regulatory body located abroad favors dismissal); *Clerides,* 534 F.3d at 629 (same); *see also In re Bridgestone/Firestone, Inc.*, 420 F.3d

702, 705 (7th Cir. 2005) (factor favored dismissal where "plaintiff's medical, employment, vehicle, and tax records are in Mexico, as is evidence of the family's pain and suffering").

More importantly, this Court's lack of compulsory process will deprive Defendants of crucial evidence that is essential to make out a defense against Plaintiffs' claims and which is in the control of AirAsia and its employees, the KNKT, and the DGCA. *See Makassar Strait*, 2011 U.S. Dist. LEXIS 2647, at *23-24. It is also highly suspect whether the KNKT or Indonesian courts would honor any request for judicial assistance to compel evidence in Indonesia for use in a United States proceeding, as the KNKT, along with AirAsia, has refused to produce such evidence. (Ex. F). Indonesia is also not a party to the Hague Evidence Convention. *See* HCCH Members, https://www.hcch.net/en/states/hcch-members (last visited Feb. 26, 2016). While Defendants could attempt to obtain evidence in Indonesia through letters rogatory, it is questionable whether they would be executed and, if so, would be inefficient at best. *See Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*, 361 F.3d 11, 21 & n.4 (1st Cir. 2004) (obtaining evidence through letters rogatory is "burdensome, costly, and time-consuming," and less certain than under the Hague Evidence Convention). And in any event, it would be impossible to compel non-willing Indonesian witnesses to the United States, and the superiority of live testimony and the inconvenience of obtaining evidence through such a process favors dismissal. *See, e.g.*, *Gulf Oil*, 220 U.S. at 511; *Clerides,* 534 F.3d at 629-30; *accord* Ex. F).

In sum, it is simply impossible to have a full and fair hearing on all facts and issues of this case in the United States without the evidence, witnesses, and third parties not subject to this Court's jurisdiction but located in Indonesia. "Thus, the private interest factors relevant to evaluating Defendants' *forum non conveniens* motion all weigh in favor of granting the motion." *Makassar Strait*, 2011 U.S. Dist. LEXIS 2647, at *25 (emphasis added).

13

b.      *Public Interest Factors.*

In looking to the local interests in having localized disputes decided at home, avoidance of conflicts of law or the application of foreign law, court congestion, and burdening citizens in an unrelated forum with jury duty, there simply can be no serious dispute that Indonesia has the overwhelming public interest for this case. *See id.* at *13, 19 (citing *Clerides*, 534 F.3d at 628). Similar to *Makassar Strait*, the crash giving rise to this suit occurred in Indonesian waters; the Aircraft was operated and maintained by an Indonesian airline, carried predominately Indonesian citizens, and was subject to Indonesian flight regulations and air traffic control; an Indonesian governmental entity recovered the wreckage and prepared an investigation on the crash; and none of the decedents or their representatives are U.S. citizens. *See id.* at *26. The initiatives taken by the KNKT in the wake of this crash, and the contrasting lack of involvement by the NTSB, also underscore Indonesia's compelling interest in this case. *See id.* Thus, "[t]he reasons why the Indonesian public has a greater interest in this litigation are obvious" and "[t]he relevant public interest factors also tip decidedly in favor of the Indonesian forum." *Id.* at *25-26.

By contrast, no U.S. forum has an interest in this litigation that even approaches the interest of Indonesia, let alone exceeds it. As noted in *Makassar Strait*, any generalized interest of a United States forum in ensuring the safety of U.S.-manufactured aircraft cannot outweigh Indonesia's substantial interest in this litigation. *Id.* at *26-27. But unlike *Makassar Strait*, this case does not involve a U.S. aircraft manufacturer. While "courts have repeatedly exercised their discretion to hold that a defendant's manufacturing activities within the U.S. do not tilt the public interest in favor of retaining jurisdiction where overseas events are the primary catalyst for litigation initiated by foreign plaintiffs," this factor must be even more tenuous in a case where a

14

French-manufactured aircraft is not even certified to fly in the United States. *See In re Aircrash Near Peixoto de Azeveda*, 574 F. Supp. 2d at 288; (Doc. 63, at 10).

The FNC doctrine is also "designed in part to help courts avoid conducting complex exercises in comparative law." *Piper Aircraft*, 454 U.S. at 251. In the same way here, this Court would be required to delve into complex issues relating to an Indonesian airline's flight operations, maintenance, and training, and sift through translated damages evidence relating to the numerous Indonesian decedents and their presumably even more numerous beneficiaries. A trial here will consume a significant amount of time and resources, which are simply not justified in light of the non-existent U.S. connection and interest. Based upon the indisputable Indonesian interest in this case, it would be patently "unfair to burden the citizens of Illinois . . . with jury duty in this case given their relative disinterestedness in the outcome." *Makassar Strait*, 2011 U.S. Dist. LEXIS 2647, at *27. In Indonesia, however, the case would proceed expeditiously, and the unfamiliar application of Indonesian law to some or all of the issues of the case would be obviated. *Id.* at *28; (Ex. D, ¶¶ 18-19). Thus, as in *Makassar Strait*, all relevant public interest factors "strongly favor the Indonesian forum." *Id.* at *29.

## IV. CONCLUSION

Indonesia is the far more convenient and proper forum to hear this case, and provides an available and suitable alternative forum in which the parties may fairly adjudicate their claims and defenses. FNC dismissal is supported by the facts and law, and Defendants respectfully request that their motion be granted upon the conditions set forth in their stipulations.

Dated: February 26, 2016

**DORIC CORPORATION**

/s/ John Maggio_____
John Maggio
Allison M. Surcouf
CONDON & FORSYTH, LLP
7 Times Square
New York, New York 10036
Phone: (212) 894-6792
jmaggio@condonlaw.com

- and -

Susan Valentine
ROBINSON CURLEY & CLAYTON, P.C.
300 South Walker Drive, Suite 1700
Chicago, Illinois 60606
Phone: (312) 663-3100
svalaentine@robinsoncurley.com

Respectfully submitted,

**HONEYWELL INTERNATIONAL INC.**

/s/ Steven L. Boldt_____
Michael G. McQuillen
Todd M. Saranecki
Charles Ingrassia
Steven L. Boldt
ADLER MURPHY & MCQUILLEN LLP
20 South Clark Street, Suite 2500
Chicago, Illinois 60603
Phone: (312) 345-0700
sboldt@amm-law.com

**GOODRICH CORPORATION**

/s/ Daniel K. Cray_____
Daniel K. Cray
Adam Carter
CRAY HUBER HORTSMAN HEIL & VANAUSDAL LLC
303 West Madison Street, Suite 2200
Chicago, Illinois 60606
Phone: (312) 332-8450
Fax: (312) 332-8451
dkc@crayhuber.com

- and -

Roberta Miranda
Nelson Camacho
FITZPATRICK & HUNT, TUCKER, PAGANO, AUBERT, LLP
Twelve East 49th Street, 31st Floor
New York, New York 10017
Phone: (212) 937-4026
roberta.miranda@fitzhunt.com

16

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 26th day of February, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will automatically send notification of such filing to all parties of record.

/s/  Steven L. Boldt_____