# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| Aris Siswanto, Personal Representative of the Heirs of Mrs. Susiyah, deceased, *et al.*, | |
| Plaintiffs, | Case No. 15-CV-5486 |
| v. | |
| Airbus Americas, Inc. *et al.*, | Judge John Robert Blakey |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

This case arises from the tragic December 28, 2014 crash of AirAsia Flight 8501 during its flight from Surabaya, Indonesia to Singapore. Plaintiffs are personal representatives of the heirs of several deceased passengers. On February 26, 2016, three of the seven named Defendants, Honeywell International, Inc. ("Honeywell"), Doric Corporation ("Doric"), and Goodrich Corporation ("Goodrich") (collectively, "Moving Defendants"), filed a joint motion to dismiss the case for *forum non conveniens*. Moving Defs.' Mot. Dismiss [77]. In support of their motion, Moving Defendants offered, *inter alia*, a declaration from Mr. Wahyuni Bahar ("Bahar"), an Indonesian attorney, regarding the adequacy and availability of Indonesia as an alternative forum. Moving Defs.' Mem. Supp. Mot. Dismiss [78] Attach. 4. On June 24, 2016, Plaintiffs filed a Motion to Bar Bahar's opinions. Pls.' Motion to Bar [109]. This Memorandum Opinion and Order addresses both pending motions. For the reasons discussed below, Plaintiffs' Motion to Bar [109] is denied

and Moving Defendants' Motion to Dismiss [77] is granted in part and denied in part.

## I.    Background

### A.    The Accident and Investigation

On December 28, 2014, AirAsia Flight 8501, operated by PT Indonesia AirAsia ("AirAsia"), crashed in the Java Sea near Borneo, Indonesia while en route from Surabaya, Indonesia to Singapore.  Moving Defs.' Mem. Supp. Mot. Dismiss [78] Attach. 1 at 13, 17.  At the time of the crash, the flight was operating in Indonesian airspace under the direction of Indonesian air traffic control.  *Id.* at 15. The crash resulted in the deaths of all 156 passengers and six flight crew on board. *Id.* at 17.  The nationalities of the 162 fatalities were as follows:  155 Indonesian, three South Korean, one French, one Malaysian, one Singaporean, and one British. *Id.* at 17-18.

Indonesia's National Transportation Safety Committee (the Komite Nasional Keselamatan Transportasi) ("KNKT") conducted the official investigation into the crash and issued its Final Report on December 1, 2015.  *See generally id.* Transportation agencies from Australia, France, Singapore, and Malaysia also participated in the inquiry.  *Id.* at 13.  The United States National Transportation and Safety Board ("NTSB") did not contribute.  *Id.*

The KNKT investigation revealed the following:  during flight, the pilots of Flight 8501 experienced four separate failures of the aircraft's Rudder Travel

Limiter Units ("RTLU's") within a period of approximately 15 minutes.[1]  *Id.* at 13. These four failures each triggered caution messages on the aircraft's Electronic Centralized Aircraft Monitoring ("ECAM") system.  Moving Defs.' Mem. Supp. Mot. Dismiss [78] Attach. 1 at 13.  The pilots remedied the first three disruptions by resetting the Flight Augmentation Computer ("FAC") that performed rudder travel limitation.  *Id.* at 15, 37.  These resets briefly returned the RTLU's to normal function.  *Id.*

After the fourth failure, however, the pilots attempted a different corrective measure and reset the FAC *circuit breakers.  Id.* at 15.  According to the KNKT report, the change in the pilots' response may have been inspired by the Pilot in Command's ("PIC's") prior experience.  *Id.* at 106.  Just four days before the crash, the PIC encountered a similar RTLU failure on the same aircraft during push back from the terminal gate.  *Id.* at 21.  After returning the aircraft to the parking bay, the pilot observed a company engineer reset the FAC circuit breakers.  *Id.*  When the pilot asked the engineer if he could perform the same reset action if the problem reappeared, the engineer stated that the pilot could reset the FAC circuit breakers whenever instructed by the ECAM.  *Id.*

The pilots' reset of the FAC circuit breakers on December 28, 2014, however, produced different consequences during flight than on the ground.  *Id.* at 106, 112. Specifically, the reset disengaged the aircraft's autopilot and the aircraft's rudder deflected two degrees to the left.  *Id.* at 104.  The KNKT report stated that at that

---

[1] An aircraft's Rudder Travel Limitation limits rudder deflection based upon speed in order to avoid high structural loads.  Moving Defs.' Mem. Supp. Mot. Dismiss [78] Attach. 1 at 36.

point, the pilots should have flown the aircraft manually and immediately leveled the wings. *Id*. at 104, 107. This, however, did not occur for several seconds. *Id*. at 104. By that time, the aircraft had rolled left up to fifty-four degrees. Moving Defs.' Mem. Supp. Mot. Dismiss [78] Attach. 1 at 104. Additionally, when the pilots finally took corrective action, commands from the PIC were ambiguous and the Second in Command ("SIC") took inappropriate countermeasures. *Id*. at 113. As a tragic result, the aircraft entered a prolonged, unrecoverable stall condition. *Id*. at 108, 113, 122.

The KNKT investigation further revealed that in the year preceding the crash, the accident aircraft experienced 23 reported Rudder Travel Limiter problems. *Id*. at 120. Despite the recurring defect, however, no AirAsia maintenance actions adequately resolved the problem. *Id*. at 121.

## B. The Aircraft

The accident aircraft, an Airbus A320-216 registered as PK-AXC, was designed, assembled, and sold by Airbus, S.A.S. Moving Defs.' Mem. Supp. Mot. Dismiss [78] Attach. 2 ¶ 6. Airbus, S.A.S. is an aircraft manufacturing company organized under French law with its principal place of business in Toulouse, France. *Id*. ¶ 3.

Airbus, S.A.S. has manufactured several variants of the A320, including the A320-216. *Id*. Final assembly of these aircraft occurs in Toulouse, France; Hamburg, Germany; and Tianjin, China. The design, assembly, and sale of the accident aircraft all occurred in Europe. *Id*. ¶ 6.

Airbus, S.A.S. sold the accident aircraft in a 2005 purchase agreement to AirAsia Berhad, a Malaysian air carrier that does not operate in the United States. *Id.* ¶ 7. AirAsia Berhad assigned the purchase agreement to Doric 10 Labuan, a Malaysian limited liability company, and Doric 10 Labuan then leased the aircraft back to AirAsia Berhad. Moving Defs.' Mem. Supp. Mot. Dismiss [78] Attach. 2 ¶ 8. In 2008, Airbus, S.A.S. delivered and transferred title to the accident aircraft to Doric 10 Labuan via AirAsia Berhad in Blagnac, France. *Id.* ¶ 9.

The European Aviation Safety Agency issued a Type Certificate for the Airbus A320-216 aircraft model, as well as individually certifying the accident aircraft. *Id.* ¶ 10. The A320-216 aircraft model, however, has not received a Type Certificate from the United States Federal Aviation Administration ("FAA") and thus, the accident aircraft did not receive individual certification from the FAA. *Id.* ¶¶ 11, 13. The A320-216 aircraft model is not operated by any Airbus, S.A.S. customer in the United States, and, to the best of Airbus, S.A.S.'s knowledge, the accident aircraft was never operated in the United States prior to its crash. *Id.* ¶¶ 12, 14.

Airbus, S.A.S. was previously a named defendant in Plaintiffs' Original, Amended, and Second Amended Complaints. Compl. [1]; Am. Compl. [6]; Second Am. Compl. [32]. On December 30, 2015, however, this Court dismissed Plaintiffs' claims against Airbus, S.A.S. for lack of personal jurisdiction. Mem. Op. and Order [63].

## C.    The Airline

AirAsia is a privately held Indonesian corporation with its headquarters in Tangerang, Baten near Jakarta, Indonesia. Moving Defs.' Mem. Supp. Mot. Dismiss [78] Attach. 6 at 1. AirAsia flies routes throughout Indonesia and to destinations in Singapore, Malaysia, and Thailand. *Id*. AirAsia does not operate any aircraft to, from, or within the United States and AirAsia has never possessed operating rights in or to the United States. *Id*.

AirAsia is not a defendant in the present suit. Pls.' Fourth Am. Compl. [135]. AirAsia refuses to voluntarily consent to jurisdiction of a court located in the United States, and, absent an order from an Indonesian court, will not make its employees available for depositions in the United States or produce documents for use in United States litigation. Moving Defs.' Mem. Supp. Mot. Dismiss [78] Attach. 6 at 2.

## D.    The Present Litigation

Plaintiffs are personal representatives of the heirs of certain deceased passengers of Flight 8501.[2] Fourth Am. Compl. [135] at 3. All Plaintiffs and decedents are citizens of countries other than the United States. *Id*. Plaintiffs bring suit against seven Defendants: (1) Honeywell; (2) Goodrich; (3) Doric; (4) Airbus Americas, Inc. ("Airbus Americas"); (5) Thales Avionics, S.A.S. ("Thales Avionics"); (6) Meggitt PLC ("Meggitt"); and (7) Artus, S.A.S. ("Artus"). Plaintiffs

---

[2] Plaintiffs' Fourth Amended Complaint [135] began with eighteen personal representatives suing on behalf of thirty-four deceased passengers. Since its filing, all Plaintiffs have reached a settlement against all Defendants, with the exception of two personal representatives suing on behalf of three deceased passengers. Pls.' Status Report on Settlement [141].

allege that each Defendant contributed to the fielding of an accident aircraft that was "defectively and unreasonably dangerous" in myriad respects. *Id.* at 4.

Plaintiffs assert that Moving Defendants—Honeywell, Goodrich, and Doric—are American corporations with their principal places of business in the United States. Fourth Am. Compl. [135] at 3-4. Plaintiffs claim that Honeywell and Goodrich designed, manufactured, and sold defective components that were ultimately installed in the accident aircraft, while Doric leased the completed accident aircraft to AirAsia.

Regarding Nonmoving Defendants, Plaintiffs allege that Thales Avionics, Meggitt, and Artus are French or British corporations that designed, manufactured, and sold other defective aircraft components. *Id.* at 3, 19, 24. Plaintiffs claim that Airbus Americas is an American corporation that marketed and promoted the accident aircraft. *Id.* at 4.

## II. Analysis

### A. Plaintiffs' Motion to Bar

Before this Court can examine the propriety of the present forum, it must first determine the admissibility of the opinions of Wahyuni Bahar, Moving Defendants' Indonesian law expert.[3] Plaintiffs proffer multiple justifications to exclude Bahar's testimony: Bahar is insufficiently qualified; his testimony lacks factual support; his opinions improperly invade the province of the Court; and he

---

[3] Bahar's opinions are located in two portions of the record: (1) Bahar's written declaration dated February 26, 2016, and (2) Bahar's deposition testimony dated May 21, 2016. Moving Defs.' Mem. Supp. Mot. Dismiss [78] Attach. 4; Pls.' Resp. Moving Defs.' Mot. Dismiss [105] Attach. 2. In support of their motion to dismiss, Moving Defendants only offered Bahar's written declaration. Nevertheless, the Court's ruling covers Bahar's opinions found in both sources.

wrongfully refused to comply with discovery. *See generally* Pls.' Motion to Bar [109]. The Court notes Plaintiffs' objections; however, none justify the drastic remedy requested.

As discussed further *infra*, Moving Defendants' Motion to Dismiss compels an evaluation of the adequacy and availability of Indonesia as an alternate forum for Plaintiffs' claims. The determination of foreign law "is an issue of law for the court." *Pittway Corp. v. United States*, 88 F.3d 501, 504 (7th Cir. 1996). Under Federal Rule of Civil Procedure 44.1,

> In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.

Thus, Rule 44.1 "permits foreign law to be proved by testimony or affidavits of experts, and that is the route followed in most cases." *Sunstar, Inc. v. Alberto-Culver Co.*, 586 F.3d 487, 495 (7th Cir. 2009); *Leibovitch v. Syrian Arab Republic*, 25 F. Supp. 3d 1071, 1081 (N.D. Ill. 2014) (expert testimony "is commonly provided to help courts apply foreign law"). This is no less true with *forum non conveniens* issues, where parties regularly proffer experts in foreign legal systems. *See, e.g.* *Stroitelstvo Bulgaria Ltd. v. Bulgarian-Am. Enter. Fund*, 589 F.3d 417, 421 (7th Cir. 2009) (experts in Bulgarian law); *In re Factor VIII or IX Concentrate Blood Products Litig.*, 484 F.3d 951, 956 (7th Cir. 2007) (experts in British law); *In re Ford Motor Co., Bridgestone/Firestone N. Am. Tire, LLC*, 344 F.3d 648, 652 (7th Cir. 2003) (experts in Venezuelan law).

Because Rule 44.1 removes admissibility precepts from foreign law determinations, Bahar need not possess the "special qualifications" normally required of factual experts. Charles Alan Wright *et al.*, *Proof of Foreign Law*, 9A Fed. Prac. & Proc. Civ. § 2444 (3d ed. 2016); *cf.* Fed. R. Evid. 702 (where "knowledge, skill, experience, training, or education" serve as prerequisites for expert testimony). Indeed, under the broad strictures of Rule 44.1, a foreign law expert "need not even be admitted to practice in the country whose law is in issue." *United States v. First Nat. Bank of Chicago*, 699 F.2d 341, 344 (7th Cir. 1983) (quoting Charles Alan Wright *et al.*, *supra*, § 2444). Similarly, Bahar's foreign law determinations need not be based upon "sufficient facts or data" nor "reliable principles and methods." *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 582 (1993).

The distinctions between Rule 44.1 and Rule 702 are highlighted in *Canales Martinez v. Dow Chemical Company*, 219 F. Supp. 2d 719, 721-22 (E.D. La. 2002). In *Canales Martinez*, foreign plaintiffs claimed that a chemical produced and used by American corporate defendants rendered them sterile. Like Moving Defendants here, the corporate defendants moved to dismiss the case to Costa Rica, Honduras, and the Philippines on the grounds of *forum non conveniens*. *Id*. at 722. In support of their opposition, the plaintiffs offered testimony from a comparative law expert. *Id*. at 723-24. Like Plaintiffs here, the corporate defendants argued that the expert was neither relevant nor reliable under Federal Rule of Evidence 702 and *Daubert* and moved to strike the expert's testimony. *Id*. at 723. The court deemed the

defendants' argument "legally unfounded." *Id*. Notably, the court stated that the defendants' motion, like Plaintiffs' motion here, was premised upon allegations that the expert's testimony "[did] not comport with a variety of evidentiary rules, but strangely, [did] not even mention in passing Federal Rule of Civil Procedure 44.1, which governs the Court's determination of foreign law." *Id*. The court stated that under that rule, it could consider "evidence not technically admissible under the Federal Rules of Evidence," so long as it was "relevant." *Id*. at 724. District courts in the Third and Eleventh Circuits have produced rulings consistent with *Canales Martinez*, albeit outside of the *forum non conveniens* context. *See HFGL Ltd. v. Alex Lyon & Son Sales Managers & Auctioneers, Inc.*, 264 F.R.D. 146, 149 (D.N.J. 2009) (foreign contract dispute) ("The purported unreliability of [an expert's] report is not a basis to remove the report from the Court's consideration."); *Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.*, No. 04-20073-CIV, 2005 WL 5955701, at *7 (S.D. Fla. Aug. 17, 2005) (foreign labor dispute).

In the end, "foreign law is an issue to be determined by the district judge." Charles Alan Wright *et al.*, *supra*, § 2444. Therefore, the purpose of expert testimony is to merely "aid the court in determining the content of the applicable foreign law, not to apply the law to the facts of the case." *Id*. As the final arbiter of the law—both foreign and domestic—the Court maintains "great discretion" in choosing its source materials, *Zurich Capital Markets Inc. v. Coglianese*, 383 F. Supp. 2d 1041, 1053 (N.D. Ill. 2005) (citing *Pittway Corp.*, 88 F.3d at 504), and may give these materials "whatever probative value [it] thinks they deserve." Charles

Alan Wright *et al.*, *supra*, § 2444; *Pancotto v. Sociedade de Safaris de Mocambique, S.A.R.L.*, 422 F. Supp. 405, 408 (N.D. Ill. 1976) ("Rule 44.1 gives district courts wide discretion in the materials to which they may resort to determine the content of foreign law.").

Given this responsibility and discretion, this Court deems it neither necessary nor efficient to parse the probative value of every statement made by Bahar in his initial declaration or subsequent deposition. *See United States v. Friedman*, 499 F. App'x 807, 808 (10th Cir. 2012) ("District courts are presumed to know and follow the law."). For the purpose of the present motions, it suffices to say that Bahar's statements, both individually and collectively, will be given the weight they deserve under the law. *See Zurich Capital Markets Inc.*, 383 F. Supp. 2d at 1053 (the Court is "free to disregard expert affidavits" when warranted). As it would for any witness, this Court will consider the entirety of Bahar's testimony, but will give "little or no credence" to opinions that are "not supported adequately" or views "offered in too partisan a fashion." Charles Alan Wright *et al.*, *supra*, § 2444. Moreover, the Court will disregard Bahar's declaration "to the extent the report [extends] beyond providing an analysis of [Indonesian] law, and [is] offered to assist the fact finder as to which facts to find." *Labuda v. Schmidt*, No. 04-CV-1281, 2005 WL 2290247, at *7 (N.D. Ill. Sept. 19, 2005). With these assurances in mind, Plaintiffs' Motion to Bar [109] is denied.[4]

---

[4] To the extent Plaintiffs' Motion to Bar is premised upon Bahar's alleged discovery violations, the Court agrees with Moving Defendants' that a discovery motion is not properly before this Court. Plaintiffs' fail to show compliance with Local Rule 37.2 or this Court's standing order concerning

### B.     Moving Defendants' Motion to Dismiss

The principle of *forum non conveniens* permits a court to "resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute."  *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 504, 507 (1947) ("[T]he venue statutes of the United States" may permit a plaintiff "to commence his action" in a particular court and "empower that court to entertain it.  But that does not settle the question whether it must do so.").  Under this doctrine, "a trial court may dismiss a suit over which it would normally have jurisdiction if it best serves the convenience of the parties and the ends of justice."  *Kamel v. Hill-Rom Co.*, 108 F.3d 799, 802 (7th Cir. 1997).  In other words, the doctrine of *forum non conveniens* "is nothing more or less than a supervening venue provision, permitting displacement of the ordinary rules of venue when, in light of certain conditions, the trial court thinks that jurisdiction ought to be declined."  *Am. Dredging Co. v. Miller*, 510 U.S. 443, 453 (1994).

> A federal court has discretion to dismiss a case on the ground of *forum non conveniens* when an alternative forum has jurisdiction to hear the case, and trial in the chosen forum would establish oppressiveness and vexation to a defendant out of all proportion to plaintiff's convenience, or the chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems.

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 429 (2007) (internal citations omitted).

---

prerequisite meet-and-confer requirements.  Regardless, even if such procedures were followed, on this record, Plaintiffs' requested remedy is unwarranted.

In exercising this discretionary power, a court applies a three-step analysis:

> At step one, a court determines the degree of deference
> properly accorded the plaintiff's choice of forum. At step
> two, it considers whether the alternative forum proposed
> by the defendants is adequate to adjudicate the parties'
> dispute. Finally, at step three, a court balances the
> private and public interests implicated in the choice of
> forum.

*Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 153 (2d Cir. 2005)

(internal citations omitted).

This three-step framework aside, the Court maintains "substantial flexibility" in considering the relative importance of the relevant factors, *Gupta v. Austrian Airlines*, 211 F. Supp. 2d 1078, 1085 (N.D. Ill. 2002), and each case "turns on its facts." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 249 (1981) (quoting *Williams v. Green Bay & W.R. Co.*, 326 U.S. 549, 557 (1946)). Superior courts have not "attempted to catalogue the circumstances which will justify or require either grant or denial of remedy. The doctrine leaves much to the discretion of the court to which plaintiff resorts." *Gulf Oil*, 330 U.S. at 508. Where a district court "has contemplated all relevant public and private interest factors and where its balancing of these factors is reasonable, its *forum non conveniens* determination warrants substantial deference." *Kamel*, 108 F.3d at 802 (internal citation omitted).

### 1. Plaintiffs' Choice of Forum Deserves Little Deference

To begin, when a plaintiff sues in his or her home forum, "there is a strong presumption in favor of that choice." *In re Factor VIII or IX Concentrate Blood Products Litig.*, 484 F.3d at 955; *Piper*, 454 U.S. at 255. Under such circumstances,

a defendant invoking *forum non conveniens* "bears a heavy burden in opposing the plaintiff's chosen forum," *Sinochem*, 549 U.S. at 430, and unless the balance "is strongly in favor of the defendant," the plaintiff's choice "should rarely be disturbed." *Gulf Oil*, 330 U.S. at 508.

This presumption, however, "applies with less force when the plaintiff or real parties in interest are foreign." *Piper*, 454 U.S. at 255 (emphasis added); *Kamel*, 108 F.3d at 803 (A "foreign plaintiff's choice of forum deserves less deference."). This "modified understanding of the typical deference paid to a plaintiff's forum choice stems not from a bias against foreign plaintiffs but from an assumption about convenience." *In re Air Crash Disaster Over Makassar Strait, Sulawesi*, No. 09-CV-3805, 2011 WL 91037, at *9 (N.D. Ill. Jan. 11, 2011). Because "the central purpose of any *forum non conveniens* inquiry is to ensure that the trial is convenient," when a plaintiff's "home forum has been chosen, it is reasonable to assume that this choice is convenient." *Piper*, 454 U.S. at 255-56; *Sinochem*, 549 U.S. at 430. When the plaintiff is foreign, however, "this assumption is much less reasonable." *Id*.

Going one step further, when application of *forum non conveniens* would send foreign plaintiffs *to* their home court, the presumption in favor of giving plaintiffs their choice of court "is little more than a tie breaker." *Abad v. Bayer Corp.*, 563 F.3d 663, 667 (7th Cir. 2009) (emphasis added).

> When the plaintiff wants to sue on the defendant's home turf, and the defendant wants to be sued on the plaintiff's home turf, all really that the court is left to weigh is the relative advantages and disadvantages of the alternative forums. In such a case there is no reason to place a thumb on the scale, since there is no prima facie reason to

14

think a plaintiff discriminated against by being sent to his home court or a defendant discriminated against by being forced to stay and defend in *his* home court.

*Id.* (emphasis in original). In these cases, the Court's focus "must be on particularized circumstances that lean in favor of U.S. courts or foreign courts." *Id.*

As in *Abad*, Plaintiffs' choice of forum in this Court is entitled to little, if any, deference. In their Fourth Amended Complaint, Plaintiffs identify both decedents and Plaintiffs themselves as citizens of countries other than the United States. Fourth Am. Compl. [135] 3. As such, "it is less reasonable" to assume that the forum chosen by Plaintiffs "is a convenient one." *Abad*, 563 F.3d at 666. Plaintiffs provide no evidence to restore this assumption. Thus, the presumption in favor of allowing Plaintiffs to stay in the court of their choice "is weakened." *Id.* A decision relegating them to litigate in the courts of or nearer to their home country will "not impose on them as great a hardship" as a ruling that would "eject" them from their "home court" and send them "to the defendant's home court in another country." *Id.* at 667.[5]

---

[5] In their response to Moving Defendants' motion, Plaintiffs asserted, for the first time, that "one of the decedents' beneficiaries is both a U.S. citizen and resident." Pls.' Resp. Moving Defs.' Mot. Dismiss [105] 7 (emphasis removed). Plaintiffs' briefings did not provide further detail or evidentiary support for their claim. Plaintiffs repeated their assertion, however, in a supplemental answer to Moving Defendants' *forum non conveniens* interrogatories, which Moving Defendants submitted in support of their Reply. Moving Defs.' Reply [115] Attach. 1 at 3. In their supplemental answer, Plaintiffs identified the beneficiary as Tommy Harsono Hiauw ("Hiauw"), brother of Mrs. Yenni (deceased), and further stated that Hiauw resides in New York (not Illinois). *Id.* Since the filing of Plaintiffs' response, however, the personal representative of the heirs of Mrs. Yenni reached a settlement against all Defendants, Pls.' Status Report on Settlement [141], rendering Plaintiffs' argument moot.

### 2. Indonesia Constitutes an Alternative Forum

The next step in the Court's analysis is to decide whether "an adequate alternative forum is available to hear the case." *Kamel*, 108 F.3d at 802. This "is a two-part inquiry: availability and adequacy." *Id.*

#### a) Indonesia is "Available" for Claims Against Moving Defendants, but not Nonmoving Defendants

An alternative forum is "available" "if all of the parties are amenable to process and within the forum's jurisdiction." *Stroitelstvo Bulgaria*, 589 F.3d at 421. Here, each of the Moving Defendants has consented to the jurisdiction of Indonesian courts and agreed to accept service of process. Moving Defs.' Mem. Supp. Mot. Dismiss [78] Attach. 5. Moreover, in Bahar's written declaration, he states that "litigation involving unlawful acts," such as Plaintiffs allege here "is within the authority of the [Indonesian] District Court to entertain and Indonesian courts are not allowed to question their jurisdiction unless a defendant raises an objection." *Id.* Attach. 4 ¶ 28. Therefore, if "the lawsuit currently pending before the Northern District of Illinois is re-filed in Indonesia, the general judicial court will have authority to adjudicate the matter." *Id.* ¶ 27.

Plaintiffs' concern that Indonesia lacks jurisdiction over the claims of *non-*Indonesian Plaintiffs is without merit. *See generally* Pls.' Motion to Bar [109] 9-10. Although Bahar conceded that Indonesia's *statutory* regime is silent on the issue, he also stated that Indonesian law derives from other, *non-*statutory sources, including custom, jurisprudence, and scholarly works. Pls.' Resp. Moving Defs.' Mot. Dismiss [105] Attach. 2 at 10:17-11:13. Bahar further stated that, under these authorities,

"Indonesian courts can have jurisdiction over a case involving foreign plaintiffs as well as foreign defendants." *Id*. at 11:15-19. Although Bahar clarified that foreign plaintiffs typically "come together with other plaintiffs, and most of the plaintiffs are Indonesians," *id*. at 13:22-14:1, such is the case here, where ninety-six percent of Flight 8501's decedents were Indonesian natives.[6] *See* Moving Defs.' Mem. Supp. Mot. Dismiss [78] Attach. 1 at 17-18.

Equally exaggerated is Plaintiffs' claim that, Moving Defendants' consent notwithstanding, Indonesian courts may nonetheless decline jurisdiction. Pls.' Motion to Bar [109] 4-5. While Bahar acknowledged that Indonesia possessed the authority to decline Plaintiffs' case upon the basis of their own *forum non conveniens* doctrine, he ultimately opined that an Indonesian court "will not easily ignore the request" and ultimately "will not object to the jurisdiction of its court." Pls.' Resp. Moving Defs.' Mot. Dismiss [105] Attach. 2 at 48:8-17, 50:13-17, 113:20-114:1. Given the local interest and importance of the present controversy, this Court agrees. [7]

---

[6] During Bahar's deposition, Plaintiffs' counsel presented other jurisdictional hypotheticals, including whether Indonesian courts would possess jurisdiction over *only* non-Indonesian plaintiffs suing *only* non-Indonesian defendants. Pls.' Resp. Moving Defs.' Mot. Dismiss [105] Attach. 2 at 14:2-16:11. Although Bahar acknowledged that jurisdiction would not attach in that instance, *id*. at 16:12-15, such are not the circumstances currently before the Court.

[7] The Court is not sufficiently convinced, however, of Indonesia's jurisdiction over Nonmoving Defendants. Because they did not join in the present motion, Nonmoving Defendants did not explicitly consent to the jurisdiction of Indonesian courts, and Bahar does not provide adequate alternative proof that such jurisdiction could be imposed. Further, Bahar's declaration never references Nonmoving Defendants. Although Bahar briefly alludes to "Airbus," this reference describes the "manufacturer" of the accident aircraft. Moving Defs.' Mem. Supp. Mot. Dismiss [78] Attach. 4 ¶ 57. Given this descriptor, the Court interprets Bahar's reference to be directed towards Airbus, S.A.S., a party previously dismissed from the present litigation, not Airbus Americas, a current Nonmoving Defendant, who Plaintiffs allege marketed and promoted the accident aircraft. Fourth Am. Compl. [135] at 4. It "is well settled" that, before dismissal for reasons of *forum non*

### b) *Indonesia is "Adequate"*

An alternative forum is adequate "if it provides the plaintiff with a fair hearing to obtain some remedy for the alleged wrong." *Stroitelstvo Bulgaria*, 589 F.3d at 421. Notably, it "is not necessary that the forum's legal remedies be as comprehensive or as favorable as the claims a plaintiff might bring in an American court. Instead, the test is whether the forum provides some potential avenue for redress for the subject matter of the dispute." *Id.* (internal citation omitted). To be inadequate, the remedy provided by the alternative forum must be "so clearly inadequate or unsatisfactory that it is no remedy at all." *Piper*, 454 U.S. at 254.

Under Indonesian law, Plaintiffs may submit claims for product liability, general negligence, and gross negligence—the same claims brought in the present litigation. Moving Defs.' Mem. Supp. Mot. Dismiss [78] Attach. 4 ¶ 64. In cases involving death, these claims may be brought by surviving family members. *Id.* ¶ 69. Tort violations may result in damages for, *inter alia*, economic loss, pain and suffering, and emotional distress. *Id.* ¶ 70.

Moreover, the Indonesian legal system affords sufficient procedural safeguards. Indonesian court hearings are generally open to the public. *Id.* ¶ 20. Parties may present both written and testimonial evidence, including expert witnesses. *Id.* ¶¶ 38-39. Indonesian witnesses may be summoned to give

---

*conveniens* can be considered warranted it "must appear to a certainty that jurisdiction of *all* parties can be had." *Aigner v. Bell Helicopters, Inc.*, 86 F.R.D. 532, 542–43 (N.D. Ill. 1980) (citing Charles Alan Wright, *et al.*, *Forum Non Conveniens—In General*, 14D Fed. Prac. & Proc. Juris. § 3828 (4th ed. 2016)) (emphasis added). Because the Court does not possess such certainty as to Nonmoving Defendants, Moving Defendants' Motion to Dismiss as it relates to Airbus Americas, Thales Avionics, Meggitt, and Artus is denied.

testimony, and all witnesses are subject to cross-examination by both opposing parties and the judge. *Id.* ¶¶ 41, 61. Verdicts are decided by a majority of a three-judge panel. *Id.* ¶ 43. Deliberations are confidential, and each judge—including the dissenter, should one exist—must give his or her judgment in writing. *Id.* The court's final decision is read in open court. *Id.* Finally, losing parties may seek independent appellate review by the country's High Courts or Supreme Court. *Id.* ¶¶ 22, 44-45.

Although Plaintiffs object to Indonesia's lack of pre-trial discovery, Pls.' Resp. Moving Defs.' Mot. Dismiss [105] 8 n.9, 13-14, Moving Defendants have agreed to make available all "employees, witnesses, and documents in its possession, custody, or control" that Indonesian courts deem relevant. Moving Defs.' Mem. Supp. Mot. Dismiss [78] Attach. 5. Regardless, "an alternative forum ordinarily is not considered 'inadequate' merely because its courts afford different or less generous discovery procedures than are available under American rules." *Mercier v. Sheraton Int'l, Inc.,* 981 F.2d 1345, 1352–53 (1st Cir. 1992) (citing *Lockman Foundation v. Evangelical Alliance Mission,* 930 F.2d 764, 768 (9th Cir. 1991) (Japanese forum held adequate although discovery procedures were "not identical to those in the United States"); *Zipfel v. Halliburton Co.,* 832 F.2d 1477, 1484 (9th Cir. 1987), *cert. denied,* 486 U.S. 1054 (1988) (Singaporean forum held adequate although depositions were allowed only in certain circumstances); *In re Union Carbide Gas Plant Disaster,* 809 F.2d 195, 205 (2d Cir. 1987), *cert. denied,* 484 U.S. 871 (1987) (Indian forum held adequate although Indian discovery rules were more

limited than United States rules)); *Hull 753 Corp. v. Elbe Flugzeugwerke GmbH*, 58 F. Supp. 2d 925, 929 (N.D. Ill. 1999). Plaintiffs may not defeat Moving Defendants' motion by merely showing that the law that would be applied in the alternative forum is less favorable to Plaintiffs than that of the United States. *Piper*, 454 U.S. at 247. Such a rule "would render all courts other than United States courts inadequate." *Patricia v. Boeing Co.*, No. 09-CV-3728, 2010 WL 3861077, at *2 (N.D. Ill. Sept. 28, 2010).

Therefore, the Court deems Indonesia an "adequate" alternative forum for Plaintiffs' claims against Moving Defendants.

### c) *Deb v. SIRVA, Inc.*

The Court is cognizant of the Seventh Circuit's recent opinion in *Deb v. SIRVA, Incorporated*, which found that another court in this District abused its discretion for dismissing a case on *forum non conveniens* grounds. – F.3d –, No. 14-2484, 2016 WL 4245497, at *1 (7th Cir. Aug. 11, 2016). The circumstances in *Deb*, however, are distinguishable from the present controversy. In *Deb*, the plaintiff sued two corporations in the Southern District of Indiana for damages sustained when an Indian moving company disposed of his personal property during his relocation from India to Canada. *Id*. at *1-2. The district court granted the defendants' *forum non conveniens* motion, and found that "both India and Canada offered appropriate alternative forums for the action." *Id*. at *2.

On appeal, the Seventh Circuit concluded that the defendants failed to show that either location was adequate and available. *Id*. at *4. In its opinion, the court

emphasized the defendants' duty to demonstrate the appropriateness of their alternatives and the district court's responsibility to hold them to that heavy burden. *Id*. at *5-6. According to the Seventh Circuit, the lower court proceedings failed on both counts. *Id*. at *6. Rather than supporting their burden of demonstrating that there was an available and alternative forum in India, the defendants instead offered allegations that they would not be subject to jurisdiction in India and simply concluded "without reasoning, law, or concessions" that India was an adequate alternative. *Id*. at *7-8. The Seventh Circuit stated that the defendants could not "have it both ways" by providing no "basis on which an Indian court might assert jurisdiction" while simultaneously asserting "that the plaintiff could sue them in an Indian court." *Id*. at *8. The defendants "offered no evidence, no experts, and no concession" justifying a finding of availability, only "generalized information" regarding India's legal system. *Id*. at *9. The court found the district court's examination of Canada's availability even less substantive. *Id*. at *10-11. As a result, "the district court failed to hold the defendants to any burden—whether heavy or not"—of demonstrating an alternate available and adequate forum for the litigation." *Id*. at *10.

In stark contrast, Moving Defendants here provide everything that the defendants in *Deb* did not. They offer substantial evidence—in the form of expert testimony—supporting the adequacy of the Indonesian courts. Moving Defs.' Mem. Supp. Mot. Dismiss [78] Attach. 4. More importantly, unlike in *Deb*, each of the Moving Defendants has explicitly conceded to Indonesian jurisdiction. *Id*. Attach. 5.

Thus, rather than contradict themselves on the seminal issue of the *forum non conveniens* test, *see Kamel*, 108 F.3d at 802 ("[I]t makes little sense to broach the subject of *forum non conveniens* unless an adequate alternative forum is available to hear the case."), Moving Defendants speak as one consistent chorus, placing this case beyond *Deb*'s import.

### 3. Private and Public Interest Factors Favor Dismissal

#### a) *Private Interest Factors*

Having found that Indonesia constitutes an available and adequate alternative, the Court turns to balancing the private and public interests implicated in Plaintiffs' choice of forum. The private interest factors that a court may consider include:

> [1] the relative ease of access to sources of proof; [2] availability of compulsory process for attendance of unwilling, and [3] the cost of obtaining attendance of willing, witnesses; [4] possibility of view of premises, if view would be appropriate to the action; and [5] all other practical problems that make trial of a case easy, expeditious and inexpensive.

*Clerides v. Boeing Co.*, 534 F.3d 623, 628 (7th Cir. 2008) (quoting *Gulf Oil*, 330 U.S. at 508).

#### (1) Access to Sources of Proof

The Court finds that the relative ease of access to sources of proof favors Indonesia over the United States. Plaintiffs argue that their claims against Moving Defendants merely involve the design, manufacture, and sale of allegedly defective aircraft components, and therefore much of the evidence Plaintiffs need to establish these causes of action exists in the United States. Pls.' Resp. Moving Defs.' Mot.

Dismiss [105] 10-11.  While this may be partially true, important product liability evidence is located in Indonesia.  For example, the remnants of the accident aircraft, including its Cockpit Voice Recorder and Flight Data Recorder, remain in possession of the KNKT.  As with any aircraft mishap, these items are crucial in ascertaining the existence of any mechanical defect and its impact, if any, upon the December 28, 2014 crash.  Moreover, other courts in this District have found that Plaintiffs' argument "carries little weight" where, as here, the defendants, "as a condition of dismissal, have agreed to make available all evidence in their possession deemed relevant" by the alternate forum.  *In re Air Crash Disaster Over Makassar Strait, Sulawesi*, 2011 WL 91037, at *6; *Clerides*, 534 F.3d at 629.

Furthermore, the Court agrees with Moving Defendants' claim that the KNKT investigation "uncovered substantial questions regarding the airline's maintenance of the aircraft," its "quality of operations," and "the competency and training of its pilots."  Moving Defs.' Mem. Supp. Mot. Dismiss [78] 11.  Thus, although Plaintiffs contend that defects in the design and manufacturing of the aircraft caused the crash, "a comprehensive action" will necessarily need to address whether the crash "was due to human error committed by employees" of AirAsia. *See Patricia*, 2010 WL 3861077, at *4.  Sources of proof regarding AirAsia's responsibility, however, reside in Indonesia, and AirAsia has refused to voluntarily produce documents or employees for use in United States litigation.  Moving Defs.' Mem. Supp. Mot. Dismiss [78] Attach. 6 at 2.

The circumstances surrounding the sources of proof in this case are analogous to those found in *Clerides*. 534 F.3d at 626. In *Clerides*, an aircraft designed and built by Boeing failed to properly pressurize after takeoff from Larnaca, Cyprus, resulting in the asphyxiation of the crew and passengers and a crash of the aircraft near Athens, Greece. *Id*. The aircraft was operated by Helios Airways, a Cyprus corporation. *Id*. The crash was investigated by agencies from Greece and Cyprus, with participation from the NTSB. *Id*. While the investigation found that the flight crew failed to recognize the aircraft's pressurization problems during flight, it also identified several secondary causes of the accident, including deficiencies by both Helios and Boeing. *Id*. at 637.

Personal representatives of one of the passengers sued Boeing in the Northern District of Illinois. *Id*. Boeing moved to dismiss based upon *forum non conveniens*, contending that either Cyprus or Greece would provide a more convenient forum. *Id*. In doing so, Boeing agreed to make all evidence and witnesses in its possession available overseas. *Id*. at 629. The district court granted the motion. *Id*. at 637. Affirming the dismissal, the Seventh Circuit noted that the record supported "both the plaintiffs' product liability claim against Boeing *and* Boeing's defense that Helios was responsible for the crash." *Id*. at 629 (emphasis added). While the sources of proof relevant to the product liability claims were located in the United States, the remainder of evidence was located primarily in Greece and Cyprus, including "evidence and witnesses related to Helios and the flight crew, the primary investigations of the crash and the wreckage, the post-

mortem examinations of the decedents, and evidence and witnesses related to the families' pain and suffering." *Id*. The Seventh Circuit found that, "given Boeing's agreement to produce its documents and witnesses in Cyprus and Greece and the location of the majority of other evidence in Cyprus and Greece, the relative ease of access to proof favored those forums over the United States." *Id*.

### (2) Availability of Compulsory Process for Attendance of Unwilling Witnesses

The Court also concludes that the availability of compulsory process for obtaining unwilling witnesses favors dismissal. Returning to *Clerides*, the Seventh Circuit noted that Helios refused to voluntarily produce any witnesses in its possession. 534 F.3d at 629. As a result, for any American litigation, "the parties would need to use the Hague Convention to obtain those witnesses' testimony through letters rogatory, and the testimony would not be live." In contrast, compulsory process for these witnesses was available in Cyprus and Greece. *Id*. Given the "large number of nonparty witnesses" and "Boeing's willingness to make its witnesses available in Greece and Cyprus," the court agreed that the "superiority of live testimony and the inconvenience of taped depositions obtained by letters rogatory favored dismissal." *Id*. at 630.

As noted above, Moving Defendants here, like Boeing in *Clerides*, have agreed to make all relevant witnesses in their control available in the alternate forum. Moreover, although AirAsia has refused to voluntarily produce employees for United States litigation, Indonesian courts may "summon any witness residing in Indonesia to give testimony during a court hearing." Moving Defs.' Mem. Supp.

Mot. Dismiss [78] Attach. 4 ¶ 61.  Additionally, unlike in *Clerides*, Indonesia is not a party to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters.  *Status Table:  Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters*, Hague Conference on Private International Law, https://www.hcch.net/en/instruments/conventions/status-table/?cid=82 (last visited August 18, 2016).  While Moving Defendants' may still issue letters rogatory, such letters are "burdensome," "costly," "time-consuming," and, absent the Hague Convention, uncertain.  *Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*, 361 F.3d 11, 21 n.4 (1st Cir. 2004).  In short, Indonesia affords both parties access to their respective witnesses, while trial in the United States would deprive Moving Defendants of key live testimony.

### (3)    The Cost of Obtaining Attendance of Willing Witnesses

The Court finds that the cost of transporting witnesses is a neutral factor, "since such costs will be incurred no matter where this litigation proceeds."  *In re Air Crash Near Athens, Greece on Aug. 14, 2005*, 479 F. Supp. 2d at 801.

### (4)    Possibility of View of Premises

Given that Flight 8501 went down over water, inspection of the crash site "is likely irrelevant."  *See In re Air Crash Disaster Over Makassar Strait, Sulawesi*, 2011 WL 91037, at *7; *In re Air Crash Near Athens, Greece on Aug. 14, 2005*, 479 F. at 801.  Therefore, this is a neutral factor in this case.

### (5)    Other Practical Problems

As discussed above, Moving Defendants possess strong incentive to question AirAsia's level of responsibility. The KNKT investigation raises similar questions regarding Airbus, S.A.S.'s design, manufacture, and assembly of other components of the accident aircraft. This Court, however, lacks personal jurisdiction over either entity. The "inability to join third parties is a substantial private interest factor weighing in favor of dismissal." *In re Factor VIII or IX Concentrate Blood Products Litig.*, 531 F. Supp. 2d 957, 973 (N.D. Ill. 2008), *aff'd sub nom.*, *Abad*, 563 F.3d at 663; *Piper*, 454 U.S. at 259.

### b)    *Public Interest Factors*

The relevant public interests factors weigh heavily in favor of the Indonesian forum. These include:

> [1] the administrative difficulties stemming from court congestion; [2] the local interest in having localized disputes decided at home; [3] the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; [4] the avoidance of unnecessary problems in conflicts of laws or in the application of foreign law; and [5] the unfairness of burdening citizens in an unrelated forum with jury duty.

*Stroitelstvo Bulgaria*, 589 F.3d at 425.

### (1)    Administrative Difficulties Stemming from Court Congestion

Since "neither party has offered useful evidence relating to the length of time to trial" in Indonesia, the Court finds that the factor of administrative difficulties

stemming from court congestion "does not favor dismissal." *In re Air Crash Near Athens, Greece on Aug. 14, 2005*, 479 F. Supp. 2d at 803.

### (2) Local Interest in Having Localized Disputes Decided at Home and the Unfairness of Burdening Citizens in an Unrelated Forum with Jury Duty

Indonesia's local interests in the subject litigation cannot be overstated. The accident aircraft originated in Indonesia, was operated by an Indonesian domestic air carrier, and carried predominantly Indonesian citizens; it crashed in Indonesian waters, while subject to Indonesian flight regulations and Indonesian air traffic control. *See Clerides*, 534 F.3d at 630 (finding that alternative fora possessed "an interest in protecting the health and safety of their residents"). The accident and its aftermath received significant local media attention. Moving Defs.' Mem. Supp. Mot. Dismiss [78] Attach. 4 ¶ 75. The nearly one-year accident investigation was led by Indonesia's National Transportation Safety Committee, which made safety recommendations to both AirAsia, an Indonesian airline, and the Directorate General of Civil Aviation, the Indonesian governmental entity responsible for regulatory oversight. *Id*. Attach. 1 at 94, 125. After the crash, Indonesia's Ministry of Transportation issued or amended multiple safety regulations. *Id*. Attach. 4 ¶ 76.

In stark contrast, similar interests from this District are nearly nonexistent. Neither the State of Illinois nor the United States played any role in the journey of Flight 8501. No American citizens are decedents of the crash. Moving Defs.' Mem. Supp. Mot. Dismiss [78] Attach. 1 at 17-18. The NTSB did not contribute to the KNKT accident investigation. *Id*. at 13. The accident aircraft did not receive

individual certification from the FAA, and was never operated in the United States. *Id*. Attach. 2 ¶¶ 13-14. AirAsia does not operate any aircraft to, from, or within the United States, and has never possessed operating rights to do so. Moving Defs.' Mem. Supp. Mot. Dismiss [78] Attach. 6 at 1. Although Plaintiffs assert that Moving Defendants participated in the defective design, manufacture, and sale of the accident aircraft, this Court gives less weight to the maxim that a defendant's home forum "has an interest in providing a forum for redress for injuries caused by one of its citizens," when, as here, we have "foreign plaintiff[s] who [were] injured in a foreign land filing suit against . . . American defendant[s] with extensive foreign dealings." *Kamel*, 108 F.3d at 804.

In short, "whatever general interest U.S. citizens may have in ensuring that products made by U.S. companies are safe pales in comparison to the much more specific interest of Indonesian citizens in evaluating who is responsible for this plane crash." *In re Air Crash Disaster Over Makassar Strait, Sulawesi*, 2011 WL 91037, at *8. Accordingly, it would be "unfair" to burden the citizens of Illinois with jury duty in this case "given their relative disinterestedness in the outcome." *Id*. (citing *Clerides*, 534 F.3d at 628).

**(3)    Interest in Having Trial in a Forum at Home with the Law that Must Govern the Action and the Avoidance of Problems in the Application of Foreign Law**

In an accompanying Memorandum Opinion in Order, the Court finds general maritime law applicable here.[8]   Federal courts are obviously "comfortable and familiar with the law of admiralty."  John Paul Jones, *The United States Supreme Court and Treasure Salvage: Issues Remaining After Brother Jonathan*, 30 J. Mar. L. & Com. 205, 227 (April 1999).   At the same time, given the adequacy and availability of the Indonesian forum, it is not the case that maritime law *must* govern.   Thus, Indonesian courts may equally avoid problematic applications of foreign law.   These factors, therefore, are neutral, and do not override the other public interest considerations already discussed.   This is consistent with *Piper*, which held that the "possibility of a change in substantive law should ordinarily not be given conclusive or even substantial weight in the *forum non conveniens* inquiry."  454 U.S. at 247.

---

[8] *Forum non conveniens* is applicable to admiralty cases.  *See, e.g., Compania Naviera Joanna SA v. Koninklijke Boskalis Westminster NV*, 569 F.3d 189, 206 (4th Cir. 2009) (affirming dismissal for *forum non conveniens* in a maritime case); *Ballard Shipping Co. v. Beach Shellfish*, 32 F.3d 623 (1st Cir. 1994) ("[F]orum non conveniens is a part of federal maritime law."); *In re Air Crash Disaster Near New Orleans, La. on July 9, 1982*, 821 F.2d 1147, 1163-1164 (5th Cir. 1987) (overruling earlier cases indicating that a different standard applies to *forum non conveniens* in general maritime cases, and holding that the principles enunciated in *Piper* govern in all cases), *vacated on other grounds*, 490 U.S. 1032 (1989); *Cruz v. Mar. Co. of Philippines*, 702 F.2d 47, 48 (2d Cir. 1983) (stating that in "exceptional situations," a court may dismiss a case "despite the applicability of federal law" and that a case involving *forum non conveniens* "presents just such an exceptional situation"); *Akofin v. Jumbo Navigation, N.V.*, 481 F. Supp. 2d 310, 314 (S.D.N.Y. 2007) ("[F]orum non conveniens is applicable to admiralty cases."); *cf. Vasquez v. YII Shipping Co., Ltd.*, 559 Fed. Appx. 841, 843-844 (11th Cir. 2014) (stating that a district court may not dismiss for *forum non conveniens* a complaint based upon the maritime law, but finding that such law did not apply).

### 4. Summary

In sum, after evaluating the availability and adequacy of Indonesia as an alternative forum, considering all relevant public and private interest factors, and weighing those factors against the level of deference due to Plaintiffs' choice of forum, this Court concludes that the circumstances favor dismissal of Plaintiff's Fourth Amended Complaint [135] as it relates to Moving Defendants. This determination is consistent with the most factually analogous cases in this circuit. *See Clerides*, 534 F.3d at 628; *In re Air Crash Disaster Over Makassar Strait, Sulawesi*, 2011 WL 91037, at *10; *Patricia*, 2010 WL 3861077, at *6.

### 5. The Concern for Piecemeal Litigation

As a final point, Plaintiffs devote substantial briefing to the claim that an order from this Court granting Moving Defendants' motion will result in piecemeal litigation, thus defeating "the purpose and intent of the *forum non conveniens* doctrine." Pls.' Resp. Moving Defs.' Mot. Dismiss [105] 1. Plaintiffs' concerns are overstated. Dismissal of some, but not all, defendants, claims, or even plaintiffs upon *forum non conveniens* grounds is not atypical. *See, e.g., Mars Inc. v. Kabushiki-Kaisha Nippon Conlux*, 24 F.3d 1368, 1376 (Fed. Cir. 1994) (claim based upon foreign patent dismissed, claims based upon American patent not dismissed); *Onita-Olojo v. Sellers,* No. 12-62064-CIV, 2014 WL 1319304, at *1 (S.D. Fla. Mar. 31, 2014) (claims brought by the estates of non-United States citizens or residents dismissed, but claims brought by estates of United States citizens or residents not dismissed); *Sonoco Products Co. v. ACE INA Ins.*, 877 F. Supp. 2d 398, 411–12

(D.S.C. 2012) (claim against Canadian insurer dismissed, claims against non-Canadian insurers not dismissed); *In re Bridgestone/Firestone, Inc.*, 305 F. Supp. 2d 927, 929 (S.D. Ind. 2004), *vacated and remanded*, 420 F.3d 702 (7th Cir. 2005), and *judgment reinstated sub nom. In re Bridgestone/Firestone, Inc. Tires Products Liab. Litig.*, 470 F. Supp. 2d 917 (S.D. Ind. 2006) (claims brought by foreign plaintiffs dismissed, but claims brought United States residents not dismissed).

Plaintiffs view *forum non conveniens* as a rigid, all-or-nothing proposition. This interpretation, however, is inconsistent with the history of the doctrine, which has "repeatedly emphasized the need to retain flexibility." *Piper*, 454 U.S. at 249. Indeed, if "central emphasis were placed on any one factor, the *forum non conveniens* doctrine would lose much of the very flexibility that makes it so valuable." *Id*. at 249-50. Ultimately, the extent to which this Court's partial dismissal of Plaintiffs' action results in "fragmented or duplicated" litigation does not turn upon its grant of Moving Defendants' motion, but rather Plaintiffs' "own decision to file suits outside the proper forum." *Lumenta v. Bell Helicopter Textron, Inc.*, No. 01-14-00207-CV, 2015 WL 5076299, at *11 (Tex. App. Aug. 27, 2015) (quoting *In re Gen. Elec. Co.*, 271 S.W.3d 681, 693 (Tex. 2008)).

## III. Conclusion

Plaintiffs' Motion to Bar [109] is denied and Moving Defendants' Motion to Dismiss [77] is granted in part and denied in part. Plaintiffs' Fourth Amended Complaint [135] as it pertains to Defendants Honeywell, Doric, and Goodrich is dismissed without prejudice.

Date: December 9, 2016

ENTERED:

John Robert Blakey
United States District Judge